**O P R, Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 73–B–116.**

United States District Court, S. D. Texas, Brownsville Division.

Jan. 30, 1975.

Daniel L. Rentfro, Brownsville, Tex., for plaintiff.

W. Boone Vastine, II, Asst. U. S. Atty., Houston, Tex., for defendant.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above-styled cause was heard by the Court without a jury and taken under submission on the 16th day of January, 1975. Having considered the testimony, exhibits, stipulations and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. This action was brought by the plaintiff under the Federal Tort Claims Act to recover damages against the defendant arising out of a spraying operation conducted in plaintiff's grapefruit orchard by agents of the defendant on March 21, 1972. Plaintiff's alleged damages are in the form of reduced crop yield from the orchard for the 1972–73 season. In reply, the defendant asserts that no damage was caused to plaintiff's orchard by the spraying operation.

2. During the year 1971, the defendant, United States Department of Agriculture (USDA), discovered infestations of the Black Fly in certain non-commercial citrus trees within the City of Brownsville, Texas. Since any infestation of the Black Fly presents a potential hazard to citrus crops in the United States, the USDA thereafter embarked upon a program designed to eradicate this pest from the Rio Grande Valley.

3. Initially, the activities of this Black Fly eradication program were directed at non-commercial trees only and consisted of spraying all such trees within the City of Brownsville. However, upon later discovery of infestations in certain commercial groves close into Brownsville, spraying operations were extended to commercial groves within the area of detected infestations.

4. In order to insure eradication of the Black Fly, the final phase of the program was a delimiting process in which the USDA extended its spraying operations throughout a buffer zone surrounding the last known areas of infestations.

5. Within this buffer zone, as mapped out by the USDA, lay the grapefruit orchard owned by the plaintiff and containing approximately twenty-five (25) acres. On March 21, 1972, a spray crew employed by Metz and Kappler, Inc., the stipulated agent of the defendant, sprayed the orchard for Black Fly. It is from this spraying that plaintiff's alleged damages in crop yield arose.

6. Plaintiff's orchard was managed and maintained by a Mr. Jim Green, a person well known in the local area for his knowledge and expertise in the management of citrus orchards and with approximately 57 years experience in owning and managing citrus orchards. Sometime prior to spraying plaintiff's orchard, the USDA contacted Mr. Green and advised him of the scheduled spraying. At that time, Mr. Green expressed a concern that the proposed spraying date might be a "little premature" for that orchard and advised USDA that he had planned to wait until April before commencing his own spraying operations in that orchard. Mr. Green offered to combine USDA's spraying with his own in April. However, upon advice of its own experts regarding incompatibility of the various sprays involved, USDA declined Mr. Green's offer and continued with its original schedule.

7. Mr. Green's concern that the scheduled date was premature was based upon the stage of blooming of the orchard at that particular time. In producing young fruit, a grapefruit orchard goes through a period of blooming which can last anywhere from two to five weeks. During the first part of this blooming period, the fresh growth con-

taining the infant grapefruit is very tender and can be easily broken off the tree. No exact formula exists for knowing when the fresh growth has toughened enough so as not to be susceptible to inadvertent damage. However, all parties involved in this litigation agreed that at the point where approximately two-thirds of the blooms or petals in the orchard have dropped from the trees most of the fresh growth should have become toughened enough to withstand spraying operations.

8. Plaintiff's orchard had started blooming sometime during the first part of March, 1972. At the time he conversed with USDA about its planned spraying operation, Mr. Green was of the opinion that spraying prior to April would be too soon and could possibly damage the new crop. Mr. Green based this opinion upon his estimation of the appropriate spraying time in relation to the orchard's petal drop. USDA's supervisor of the Black Fly project inspected the plaintiff's orchard approximately one week prior to the spraying date.

9. The spraying of plaintiff's field was performed by the USDA's agent on March 21, 1972. The equipment used to apply the spray was a Hardie Air Blast Sprayer. This type of equipment utilizes an air blast with an approximate velocity of 80 to 90 miles per hour as the means of conveying the spray material onto the trees.

10. Both the plaintiff and Mr. Green at separate times on the afternoon of March 21, 1972, inspected the orchard. Each noticed at the time of their inspection a large amount of young fresh growth on the ground both under the trees as well as in the rows between the trees.

11. Although the Black Fly threat in the Brownsville area warranted governmental concern and necessitated prompt eradication of the pest, it was not in March of 1972, of such proportions that spraying of plaintiff's orchard could not have been postponed until April without seriously hampering the USDA's eradication efforts. In fact, it was the USDA's practice to delay spraying operations in a particular orchard if the scheduled date interfered with harvesting of the 1971–72 crop. Additionally, USDA's spraying operations in the Brownsville area continued on into the months of April and May, 1972.

12. The crop yields for plaintiff's orchard from 1969–70 through 1973–74 were as follows:

(a) Total yields:

| 1969–70 | 337.965 | short tons |
| 1970–71 | 245.9835 | " " |
| 1971–72 | 396.47 | " " |
| 1972–73 | 214.865 | " " |
| 1973–74 | 492.53 | " " |

(b) Approximate per acre yield:

| 1969–70 | 13 | short tons |
| 1970–71 | 10 | " " |
| 1971–72 | 16 | " " |
| 1972–73 | 8.5 | " " |
| 1973–74 | 20 | " " |

13. During the years 1972–73, plaintiff's orchard was properly maintained and fertilized by Mr. Green. Also during the same period, there occurred no phenomena, natural or otherwise, which could have damaged the orchard's crop yield other than the USDA spraying operation on March 21, 1972.

14. The USDA spraying operation on March 21, 1972 damaged the crop yield in plaintiff's orchard. Even given the fact that 1972–73 would have been in citrus terminology a "down" year for plaintiff's orchard, that orchard should have absent any damage yielded a crop of approximately 12 short tones per acre. Instead, the orchard yielded only 8.5 short tons per acre.

15. The total crop yield for plaintiff's orchard in 1972–73 was 214.865 short tons. If the orchard should have yielded 12 short tons per acre instead of the actual yield of 8.5 short tons, the corresponding total crop yield for the orchard in 1972–73 should have been approximately 303.33 short tons. (214.865/X=8.5/12).

16. Plaintiff sold his 1972–73 crop of 214.865 short tons at a price of $80.00 per short ton. The sale was on a "clean tree" basis, meaning that all fruit was sold at the same price regardless of size.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this case under the Federal Tort Claims Act. 28 U.S.C.A. § 1346(b).

2. The question of agency was not at issue as it was stipulated that Metz and Kappler, Inc. in this spraying operation were agents of the Government acting within line and scope of their authority.

3. The main contested issue was whether or not the spraying operation actually reduced the production of the orchard which encompassed the question of probable cause. The Court has found that the spraying operation did actually effect the yield and the main problem is the question of damages. The Court has explained in paragraphs 14, 15 and 16 of the Findings of Fact its reasoning in the assessing of damages.

It is therefore ordered, adjudged and decreed by the Court that the plaintiff have and recover from the defendant the sum of $7,077.20, with interest at the rate of 6% per annum from date of judgment until paid.[1] Costs, in accordance with Section 2412 of Title 28, U.S. C., to be taxed against the defendant. A judgment will be entered accordingly.

---

[1]. Interest is not allowable until judgment date in this type of case pursuant to Section 2674, Title 28, U.S.C.